# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ERNEST FRANCIS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:20-cv-288 (SRU) |
| | : | |
| FORMER COMMISSIONER | : | |
| MEACHUM, et al., | : | |
| Defendants.[1] | : | |

## INITIAL REVIEW ORDER

On March 2, 2020, Ernest Francis, a sentenced inmate currently incarcerated at MacDougall-Walker Correctional Institution ("MacDougall"), filed this *pro se* action pursuant to 42 U.S.C. § 1983. *See* Compl., Doc. No. 1.[2]  In it, Francis alleges that several supervisors within the Connecticut Department of Correction (the "DOC") have violated Francis's Eighth Amendment right to be free from cruel and unusual punishments by exposing him to—and concealing the existence of—unhealthy and hazardous conditions at Osborn Correctional Institution ("Osborn") during his two periods of confinement there:  (1) 1992–94 and (2) 2014–18.[3]  (Although Osborn was known as "Somers" between 1992 and 1994, I will refer to the institution as "Osborn" throughout for purposes of clarity.)  Francis sues the following defendants in both their official and individual capacities:  (1) former DOC commissioner Larry

---

[1]  The clerk is respectfully instructed to amend the case caption as it appears here.  First, the clerk is directed to correct the ordering of the plaintiff's name.  Currently, the plaintiff's name appears as Francis Ernest, but his name is Ernest Francis.  *See Ernest Francis*, Inmate Information, CT State Dep't of Corr., http://www.ctinmateinfo.state.ct.us (enter Francis's name or inmate number 176318) (last visited Oct. 17, 2020); *see also Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (noting that a court may "take judicial notice of relevant matters of public record."); Fed. R. Evid. 201(b).  Second, the clerk is directed to correct Defendant Meachum's name.  The name of the former commissioner of the Connecticut Department of Correction is Larry Meachum, not Larry Meechum.  *See Commissioners*, CT State Dep't of Corr., https://portal.ct.gov/DOC/History/History-Commissioners (last visited Oct. 17, 2020).

[2]  This case was initially assigned to District Judge Michael P. Shea, but it was transferred to me on October 1, 2020.  *See* Order of Transfer, Doc. No. 8.

[3]  Francis also makes fleeting mention of the Clean Water Act, his "right of access to the courts," and "Equal Protection."  *See* Compl., Doc. No. 1, at 2; *see also id.* at ¶ 57.  As I explain below, though, to the extent that Francis does assert such claims, they are severed from this action.

Meachum (1987–94), (2) former DOC commissioner Scott Semple (2014–18),[4] (3) former

Osborn warden Lawrence R. Tilghman (1989–93),[5] (4) former Osborn acting warden Michael B.

Bonzagni (1993),[6] (5) former Osborn warden Edward Maldonado (2014–17),[7] (6) former Osborn

warden William Faneuff (2017–18),[8] (7) Osborn's facility engineer John Doe (1992–94), and (8)

Osborn's facility engineer Kevin Roy (2014–18) (collectively, the "Defendants"). *See* Compl.,

Doc. No. 1, at 3–4 ("Parties").  Francis also lists the State of Connecticut as a defendant. *See id.*

at 1.  Francis seeks injunctive relief from the Defendants in their official capacities and

compensatory and punitive damages from the Defendants in their individual capacities.

## I.        Standard of Review

Under 28 U.S.C. § 1915A, I must review a prisoner civil complaint and dismiss any

portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief

may be granted, or that seeks monetary relief from a defendant who is immune from such relief.

This standard of review "applies to all civil complaints brought by prisoners against

governmental officials or entities regardless of whether the prisoner has paid a filing fee."

---

[4] *See Commissioners*, CT State Dep't of Corr., https://portal.ct.gov/DOC/History/History-Commissioners (last visited Oct. 17, 2020).

[5] Although Francis refers to a former Warden "Tillman," Francis is most likely referring to former Warden Lawrence R. Tilghman.  *See Osborn Corr. Institution*, CT State Dep't of Corr., https://portal.ct.gov/DOC/Facility/Osborn-CI (last visited Oct. 17, 2020).

[6] Francis refers to "Warden Bonzagni."  The DOC website does not list anyone named "Bonzagni" ever having served as Warden of Osborn.  However, in my view, Francis is most likely referring to Michael B. Bonzagni, who was warden of the former MacDougall facility from 1993 to 1995.  *See Wardens of Closed/Consolidated Facilities*, CT State Dep't of Corr., https://portal.ct.gov/DOC/History/History-Wardens-of-Closed-Consolidated-Facilities (last visited Oct. 17, 2020).  Bonzagni also was apparently the acting warden at Osborn for a short time in 1993.  *See Connecticut Prison Warden Quits Abruptly*, https://www.nytimes.com/1993/02/01/nyregion/connecticut-prison-warden-quits-abruptly.html, N.Y. TIMES (Feb. 1, 1993).

[7] *See Osborn Corr. Institution*, CT State Dep't of Corr., https://portal.ct.gov/DOC/Facility/Osborn-CI (last visited Oct. 17, 2020).  Francis alleges that Maldonado was warden at Osborn from 2014 to 2018; the DOC website indicates that Maldonado was warden until 2017.  The difference is immaterial for purposes of this initial review.

[8] *See Osborn Corr. Institution*, CT State Dep't of Corr., https://portal.ct.gov/DOC/Facility/Osborn-CI (last visited Oct. 17, 2020).

*Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004) (cleaned up).

Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "[p]ro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## II.      Background

Francis has been continuously incarcerated since at least 1992, but, as best as I can tell from Francis's complaint, he has been incarcerated at Osborn for just two periods:  (1) 1992–94, and (2) 2014–18.  This complaint concerns Francis's conditions of confinement at Osborn during those two periods.  Today, Francis claims that he suffers from the following maladies as a result of his exposure to hazardous conditions at Osborn:  (1) kidney damage, (2) severe cramps, (3) high creatine levels, (4) emotional and psychological injuries, (5) weight loss, anxiety, and nightmares.  *See* Compl., Doc. No. 1, at ¶¶ 41–43, 54–55.

### A.  1992 to 1994:  First Period at Osborn

On April 15, 1992, Francis entered Osborn for the first time.  *See id.* at ¶ 1.  Francis "began to experience severe skin problems," and he "noticed that the water had a putrid odor and

3

was cloudy when poured into a cup." *Id.* After Francis inquired about the water quality, Warden Tilghman advised him that the water was safe. *Id.* Francis asserts that "[t]hese series of events carried through" the tenures of Warden Tilghman, Acting Warden Bonzagni, and "John Doe Warden." *See id.*[9]

At some point, Francis was moved from C-Unit to the Q-Block housing unit in Osborn. *Id.* at ¶ 2. While in the Q-Block, Francis reports that he was exposed to dangerous levels of asbestos and polychlorinated biphenyls ("PCBs"). Those PCBs were in the caulking of windows, doors, showers and the floor. *See id.* at ¶ 5. Francis claims that his eyes, nose, and mouth absorbed "fugitive" PCBs that had dried and flaked off those surfaces when exposed to the sun. *Id.* at ¶ 6. Francis also claims that, when it rained, PCBs ran down Osborn's external walls and contaminated the soil, the catch basin, the sewer system and the water well. *Id.* at ¶ 7. Francis notes that he breathed in PCBs during recreation when the soil was kicked up. *Id.* at ¶¶ 8, 56. Further, Francis was exposed to PCBs when he showered—the steam acted as a carrier for the PCBs. *Id.* at ¶¶ 8–9.

While Francis was in Q-Block, Warden Tilghman and facility engineer Doe authorized asbestos removal from the substrates in the Q-Block housing unit. *Id.* at ¶ 10. A contractor performed the work. *See id.* at ¶ 11. During the three-day removal process, the inmates were moved from one side of the unit to the other. *Id.* The construction company[10] placed plastic

---

[9] This is the only time that Francis's complaint mentions "John Doe Warden." Francis may be referring to Robert J. Kupec, who was apparently warden at Osborn from 1993–95. *See Osborn Corr. Institution*, CT State Dep't of Corr., https://portal.ct.gov/DOC/Facility/Osborn-CI (last visited Oct. 17, 2020). However, "John Doe Warden" is not a defendant in this action because Francis does not name "John Doe Warden" in this case's caption. *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties."). Accordingly, I consider neither "John Doe Warden" or Robert J. Kupec to be a defendant in this case.

[10] Francis refers to that construction company as "John Doe construction company," but he does not name that company as a defendant and does not appear to bring any claim against that company. Thus, I do not consider "John Doe construction company" to be a defendant in this case. *See* Fed. R. Civ. P. 10(a) ("The title of the

sheeting over the work area; however, asbestos was released into the Q-block housing unit because "several segments of the plastic barrier w[ere] compromised." *Id.* at ¶ 12. The inmates were affected because cell doors have no windows that can remain covered or sealed. *Id.*

Francis alleges that, in 1993, unsafe levels of perchloroethylene ("PCE"),[11] a possible carcinogen, were discovered in Osborn's water supply wells, and it was determined that the PCE originated from Osborn. *Id.* at ¶ 14. Francis claims that, as a result, the Rye Hill Circle area of Somers, Connecticut was declared a State Superfund site in 1993. *Id.*; *see also State Superfund Program*, CT. Dep't of Energy and Envt'l Protection, https://portal.ct.gov/DEEP/Remediation--Site-Clean-Up/Superfund-Programs/State-of-Connecticut-Superfund-Program#Rye (last visited Oct. 17, 2020). Still, Francis alleges that Commissioner Meachum and Warden Tilghman failed to notify the Osborn inmate population about the danger to the water supply. *Id.* at ¶ 15. Connecticut hired an environmental contractor to assist with site remediation. *Id.* Still, "subsequent pockets" of PCE were found near Osborn in the storm drain. *Id.* at ¶ 16.

According to Francis, both the State Department of Environmental Protection (the "DEP") and the DOC[12] knew of the dangers that unsafe levels of PCE posed, but they "fraudulently concealed . . . the dangers located inside and outside of the prison." *Id.* at ¶ 20. Indeed, Francis claims that the PCE levels in samples from Osborn's ground water were "hundreds of times higher than that" allowable, according to the DEP. *Id* at ¶ 19. Residents of the Rye Hill area in Somers were provided with water filters and other "hazardous preven[ta]tive

---

complaint must name all the parties.").

[11] Perchloroethylene is also known as tetrachloroethylene, and Francis refers to both in his complaint. *See* Tetrachloroethylene (Perchloroethylene), Ctrs. for Disease Control and Prevention (June 21, 2019), https://www.cdc.gov/niosh/topics/tetrachloro/default.html.

[12] Neither the DEP nor the DOC is a party to this action. I do not consider them defendants in this case. *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties.").

measures" at state expense, while the health of Francis and other inmates was ignored.  *Id.* at ¶ 20.  Osborn officials did not notify inmates that the drinking water was contaminated.  *Id.* at ¶ 16.  Instead, Francis learned from correctional staff that they had been advised not to drink the water and that no workers' compensation claims would be honored for incidents related to the water.  *Id.* at ¶ 17.  Francis continued to drink yellow water that had a putrid smell.  *Id.* at ¶ 18.  Francis filed a grievance with Warden Maldonado[13] about buying water to drink, but his request was denied.  *Id.*  Francis experienced dizzy spells, headaches, constipation, and severe cramps.  *Id.*

Francis also makes a rather confusing claim about a private company called Correctional Enterprise Corporation ("CEC"), another party that is not a defendant in this action.  Francis alleges that CEC produced goods—such as pants, shirts, sheets, furniture, and mattresses—for the DOC.  *Id.* at ¶ 44.  Francis claims that CEC operated "with zero oversight" and, sometime between 1992 and 1994, an inmate died after he fell into a tank filled with toxic chemicals that had been used to strip furniture of its lacquer.  *See id.* at ¶ 45.  Francis alleges that CEC generally "would routinely dispose of hazardous chemicals" by draining them into areas from which those chemicals "would eventually contaminate" Osborn's drinking water.  *Id.* at ¶¶ 45–46.  Francis claims that Commissioner Meachum, Warden Tilghman, Warden Bonzagni, and facility engineer John Doe were aware of these events but took no steps to remedy the situation.  *Id.* at ¶¶ 47–48.

Sometime in 1992 or 1993, Francis noticed that his fingers "were losing mel[a]nin and his face was severely acne scared"; he also experienced severe cramps on the left side of his

---

[13]  This reference to Warden Maldonado is confusing because it mixes up time periods.  In this portion of his complaint, Francis is discussing PCE contamination between 1992 and 1994, but Maldonado was not warden at Osborn until 2014.  In my view, Francis's mix-up is likely a simple mistake, and so I construe this allegation as against the warden of Osborn at the relevant time, who was either Warden Tilghman or Acting Warden Bonzagni.

stomach and pancreas area. *Id.* at ¶ 13. Francis wrote to the Osborn warden and staff about his maladies, but he had no success. *Id.* at ¶ 14. In February 1994, Francis was transferred to MacDougall, where he still suffered from the pains in the left section of his pancreas and bloody stool, but the melanin in his skin returned. *Id.* at ¶ 21.

    B. <u>2014 to 2018:  Second Period at Osborn</u>

    Between February 1994 and 2014, Francis resided at prisons other than Osborn. Those were:  MacDougall, Garner Correctional Institution, and Cheshire Correctional Institution ("Cheshire"). *Id.* at ¶¶ 21–23. In 2014, Francis was transferred back to Osborn, where he remained until February 3, 2018. *See id.* at ¶¶ 23–24, 49. During that time, Francis lived in H-Block and Q-Block. *See id.* at ¶ 26. During Francis's second spell at Osborn, Francis claims that the wardens were Maldonado, Rodriguez,[14] and Faneuff. *Id.* at ¶ 24. Francis claims that as soon as he arrived back at Osborn, he "immediately began to experience severe pain in his side as well as light headedness and fatigue." *Id.* at ¶ 23.

    Francis alleges that Maldonado, Rodriguez, and Faneuff were "fully aware of the dangers of the water." *Id.* at ¶ 24. Whenever the DEP was scheduled to test the water quality at Osborn, "maintenance staff would po[u]r high levels of chlorine into the water" to make it appear safer than it was. *Id.* at ¶ 25. Maldonado, Faneuff, Rodriguez, and Tilghman[15] were aware of high

---

[14] As described above, the DOC website indicates that Maldonado was warden at Osborn from 2014–17 and that Faneuff was warden from 2017–18. *See Osborn Corr. Institution*, CT State Dep't of Corr., https://portal.ct.gov/DOC/Facility/Osborn-CI (last visited Oct. 17, 2020). In between them, the DOC website indicates that Kimberly Weir was warden in 2017. *See id.* However, there is no indication that anyone named "Rodriguez" was warden at Osborn during this period. An individual named Nick Rodriguez was warden at Northern Correctional Institution from 2017–19. *See Northern Corr. Institution*, CT State Dep't of Corr., https://portal.ct.gov/DOC/Facility/Northern-CI (last visited Oct. 17, 2020).

In any event—even if Francis sometimes refers to Rodriguez as a "defendant," *see* Compl., Doc. No. 1, at ¶ 26—Rodriguez is not a defendant in this case because Francis does not list him as a defendant in the title of the complaint. *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties.").

[15] Again, Francis's recounting is confusing because it mixes up time periods. Tilghman was warden from

levels of bacteria—from fecal matter and otherwise—in the Osborn water.  *Id.* at ¶ 26.   Indeed, Francis claims that his (and other inmates') breath "smelled of fecal matter . . . as a result of drinking the contaminated water."  *Id.* at ¶ 27.  Francis also claims that several inmates at Osborn—but not Francis himself, apparently—developed helicobacter pylori bacterial infections.  *Id.* at ¶ 30.  Although Francis filed several grievances and sought to purchase bottled drinking water, his requests were denied by Maldonado, Faneuff, and Rodriguez despite their knowledge of the dangers associated with the water.  *Id.* at ¶ 28.  In addition, Commissioner Semple and Commissioner John J. Armstrong[16] "refused to allow the sale of [b]ottled water" or to supply Osborn with water filters because "they did not want to take responsibility" or to "admit that the water was toxic."  *Id.* at ¶ 29.

Francis also makes certain allegations regarding asbestos.  For instance, he alleges that the relevant defendants knew of the dangers posed by asbestos within the Q-Block housing unit; indeed, they had received notice in 2014 that the Q-Block housing unit should be closed.  *See id.* at ¶¶ 31–32.  However, the relevant defendants "failed to take the proper action to close the housing unit" or to "remedy the dangerous toxins within the housing unit."  *Id.* at ¶ 32.  Francis worked in the Osborn law library, where he was ordered to clean pipes and windows that he now knows were insulated with asbestos and "P.C.B. related materials."  *Id.* at ¶ 33.

---

1989 to 1993, but here Francis's allegations regard the period between 2014 and 2018.  Thus, I construe this allegation as not applying to Tilghman.

[16]  This is the only time that Francis's complaint mentions "Commissioner Armstrong."   Francis is likely referring to Commissioner John J. Armstrong, who was commissioner from 1995 to 2003.  *See Commissioners*, CT State Dep't of Corr., https://portal.ct.gov/DOC/History/History-Commissioners (last visited Oct. 17, 2020).  Those dates are irrelevant with respect to Francis's claims about Osborn between either 1992 and 1994 or 2014 and 2018. In any event, Commissioner Armstrong is not a defendant in this case because Francis does not name him in this case's caption.  *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties.").

On an unspecified date, Francis alleges that the relevant defendants authorized the illegal drilling of sewer pipes, which allowed fecal matter to escape into the Q-Block housing unit and caused it to "fill with a stench that sicken[e]d the whole unit and caused nausea." *Id.* at ¶ 32. Put differently, Francis claims that the relevant defendants allowed holes to be bored into domestic water lines inside Osborn that had a gas build up and so caused a sulfur-like smell to emanate throughout Osborn. *Id.* at ¶¶ 36–37.

Francis alleges that Warden Maldonado, Warden Faneuff, Rodriguez, and Commissioner Semple were "fully aware" of several hazardous conditions beyond Osborn's contaminated water. *Id.* at ¶ 34. For instance, Francis alleges that those officials knew that several correctional officers had applied for workers' compensation against the DOC regarding the hazardous working conditions at Osborn. *See id.* Indeed, Francis claims that the State of Connecticut's Department of Public Health (the "DPH")[17] cited Osborn on several occasions between 2008 and 2015. *Id.* at ¶ 35. And, in a 2012 "attempt[] to renovate" Osborn,[18] a construction company "performed a porous substrate and exterior cover sampling for [PCBs] containing caulk glazing." *Id.* at ¶ 38. Those samples were sent to the DPH and tested positive for PCBs. *Id.* at ¶ 39. Despite all that, Francis alleges that the relevant defendants hid those dangers so they could "continue to collect a revenue stream from the state of Connecticut." *Id.* at ¶¶ 35, 40.

---

[17] Francis says that the DPH "knew of the dangers at [Osborn] . . . and yet took no measures to remediate the dangers at the facility." Compl., Doc. No. 1, at ¶ 40. However, once more, the DPH is not a defendant in this case because Francis did not name them in the title of the complaint. *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties.").

[18] As already discussed, Francis was not at Osborn in 2012.

In late 2016, Q-Block housing was closed.  Francis apparently filed a grievance about that closure, and Warden Maldonado answered that grievance.  *See id.* at ¶ 49.  Warden Maldonado advised Francis that Q-Block was closed for reasons unrelated to health concerns.  *See id.*  However, Francis alleges that that was a lie:  Warden Maldonado, Commissioner Semple, facility engineer Kevin Roy, and Facility Engineer John Doe[19] knew that Q-Block housing was "structurally unsafe" for the inmate population.  *Id.* at ¶¶ 49–50.  Still, those defendants recklessly and maliciously continued Q-Block's operation.  *See id.* at ¶ 52.

### III.     Discussion

Francis's complaint is confusing because it sometimes mixes time periods and defendants.  As best as I can tell, Francis's central claim is that during his two periods of confinement at Osborn—from 1992 to 1994 and from 2014 to 2018—he was subjected to unlawful conditions of confinement in violation of the Eighth Amendment's prohibition against cruel and unusual punishments.  The thrust of Francis's claim regarding his incarceration at Osborn from 2014 to 2018 is highly similar to the claims advanced in a class action currently pending before me:  *Toliver, et al. v. Semple, et al.*, No. 3:16-cv-1899 (SRU).  In fact, as discussed below, Francis appears to be a member of both the class and sub-class in that matter.  Because this case and *Toliver* "involve . . . common question[s] of law or fact," I will consolidate this matter into *Toliver*.  Fed. R. Civ. P. 42(a).  The remainder of Francis's claims—those that do

---

[19] Once more, Francis's recounting is confusing because it mixes up time periods.  "John Doe Facility Engineer" was, according to the complaint, facility engineer at Osborn between 1992 and 1994.  Here, however, Francis's allegations regard the period between 2014 and 2018.  Thus, facility engineer John Doe is irrelevant to this allegation, and I construe this allegation as not applying to John Doe.

not regard the water, asbestos, or PCBs at Osborn between 2014 and 2018—are severed from this action. Francis may file separate lawsuits regarding those alleged violations.

The Eighth Amendment's prohibition against cruel and unusual punishments "places restraints" and imposes duties on prison officials to provide humane conditions of confinement. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Thus, the Eighth Amendment protects against punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). Although the Constitution does not require "comfortable" prison conditions, the Eighth Amendment requires prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care," and to "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832–33 (cleaned up).

To state a claim under the Eighth Amendment based on conditions of confinement, an inmate must demonstrate both an objective and a subjective element. To meet the objective element, an inmate must allege that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of "life's necessities" or a "substantial risk of serious harm." *Id.* at 834 (cleaned up). To meet the subjective element, an inmate must allege that the defendant prison officials possessed culpable intent, that is, that the officials knew that the inmate faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See id.* at 834, 837. Thus, an allegation of merely negligent conduct is insufficient to support an Eighth Amendment claim. *Id.* at 835. Rather, the subjective element requires that a plaintiff allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006).

A. <u>I Dismiss Francis's Claims against the State of Connecticut and its Agencies.</u>

Francis lists the "State of Connecticut" as a party in this case's caption and, throughout his complaint, mentions several state agencies—the DEP, the DPH, and the DOC.  As I have already noted, those state agencies are not defendants in this action because Francis has not named them in the title of this complaint.  *See* Fed. R. Civ. P. 10(a); *see also supra nn.*12, 17. Regardless, Francis cannot sue the State of Connecticut or any of its agencies pursuant to section 1983.  Section 1983 creates a private right of action against every "person" who, under color of state law, deprives a plaintiff of a federally protected right.  *See* 42 U.S.C. § 1983; *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930 (1982).  "[A] State is not a person within the meaning of § 1983."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989).  State agencies, too, are not "persons" within the meaning of section 1983.  *See, e.g.*, *Smith v. Conn. Dep't of Corr.*, 2014 WL 3824357, at *4–6 (D. Conn. 2014).  Further, when a party sues a State or its agencies directly—and if the State has not waived (or Congress has not abrogated) its sovereign immunity—"the Eleventh Amendment bars a federal court from granting any relief on that claim."  *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 120 (1984).  Thus, Francis's Eighth Amendment claims against the State of Connecticut (and the state agencies that he names throughout the complaint) are not plausible, and I dismiss them pursuant to 28 U.S.C. § 1915A.

B. <u>Eighth Amendment Conditions of Confinement Claim Regarding 2014–2018</u>.

In *Toliver*, a group of "current and former inmates" at Osborn brought an Eighth Amendment conditions of confinement claim against DOC officials pursuant to section

1983.  *See Toliver*, No. 3:16-cv-1899, Am. Compl., Doc. No. 114, at ¶ 1.  In September

2019, I certified a class and sub-class in *Toliver* as follows:

> (1)  Contaminated Water Class comprised of all current and former inmates of
> Osborn who, from November 19, 2013 through the present, have had to drink
> and shower in tap water from one or more of the onsite wells at Osborn, whether
> or not such current or former inmates were housed in Q Buildings.
>
> (2)   Q Buildings Subclass comprised of all current and former inmates of
> Osborn who were housed in the Q Buildings from November 19, 2013 through
> the closing of the Q Buildings in or around December 2016, who may have
> been exposed to PCBs and friable asbestos.

Ruling, Doc. No. 147, at 11.

As is apparent from that description, Francis appears to be a member of both the

Contaminated Water Class and the Q Buildings Subclass.  Francis indicates that he lived in

both H-Block and Q-Block during his second spell at Osborn from 2014 to 2018.  See

Compl., Doc. No. 1, at ¶¶ 23–24, 26–27.  And Francis raises concerns about his exposure to:

(1) contaminated water at Osborn, *id.* at ¶¶ 24–30, 34–43; (2) friable asbestos located within the

Q-Block housing unit, *id.* at ¶¶ 31–32; and (3) PCBs in the Q-Block housing unit, *id.* at ¶¶ 33,

39.

"If actions before the court involve a common question of law or fact, the court may . . .

consolidate the actions."  Fed. R. Civ. P. 42(a).  Whether to consolidate pending actions is a

question within the discretion of the court.  *See Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d

265, 269 (S.D.N.Y. 2015).  In exercising its discretion, a court should consider whether

> the specific risks of prejudice and possible confusion [are] overborne by the risk of
> inconsistent adjudications of common factual and legal issues, the burden on the
> parties, witnesses, and available judicial resources posed by multiple lawsuits, the
> length of time required to conclude multiple suits as against a single one, and the
> relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir. 1990).  Of course, "efficiency cannot be permitted to prevail at the expense of justice."  *Devlin v. Transp. Commc'ns Intern. Union*, 175 F.3d 121, 130 (2d Cir. 1999).  Cases need not be identical to be consolidated:  Differences in defendants and causes of action, for instance, do not necessarily counsel against consolidation. *See Rauch v. Vale S.A.*, 378 F. Supp. 3d 198, 204 (E.D.N.Y. 2019).

I hold that considerations of justice and judicial economy both counsel in favor of consolidating the relevant portion of Francis's complaint into the *Toliver* action.  First, Francis's allegations indicate that he is a member of the Contaminated Water Class and the Q Buildings Subclass in *Toliver*.  Second, the gravamen of Francis's complaint is an Eighth Amendment conditions of confinement claim regarding (1) the tap water at Osborn, (2) friable asbestos in the Q-Buildings, and (3) PCBs in the Q-Buildings.  Third, the *Toliver* case is much further along than Francis's case:  The parties in *Toliver* are actively engaged in discovery.  Indeed, the *Toliver* case was filed over three years before this case.  Fourth, allowing Francis's case to proceed separate from *Toliver* might result in inconsistent adjudications on common questions of law and fact.  Thus, I will permit Francis's Eighth Amendment claims arising from his exposure to contaminated water, PCBs and friable asbestos during his confinement at Osborn between 2014 and 2018 against Warden Maldonado, Commissioner Semple, Warden Faneuff, and Kevin Roy to proceed, and I consolidate this case, so limited, into *Toliver*.[20]

---

[20]  Two differences between this case and *Toliver* bear mentioning, but neither counsels against consolidation.  First, Warden Faneuff is not a defendant in *Toliver*.  However, as explained above, the fact that two actions do not contain entirely overlapping defendants does not necessarily mean that they should not be consolidated.  *See Rauch*, 378 F. Supp. 3d at 204.  Second, I have noted that the plaintiffs in *Toliver* "primarily seek injunctive relief with respect to their conditions of confinement."  *Toliver*, No. 3:16-cv-1899, Ruling, Doc. No. 147, at 8.  In this case, Francis seeks both injunctive and monetary relief.  *See* Compl., Doc. No. 1, at 22–23 (prayer for relief).  That difference, too, does not change my mind.  The plaintiffs in *Toliver* also seek both injunctive and monetary relief.  *See Toliver*, No. 3:16-cv-1899, Am. Compl., Doc. No. 114, at ¶¶ 85, 89.  Further, several of the cases already consolidated into *Toliver* seek both injunctive and monetary relief.  *See, e.g., Jennings v. Semple, et*

C.  <u>I Will Sever Francis's Remaining Claims and Dismiss Them Without Prejudice</u>.

Francis's complaint does not only raise an Eighth Amendment conditions of confinement claim regarding his confinement at Osborn from 2014 to 2018.  Most notably, Francis alleges a similar Eighth Amendment conditions of confinement claim regarding his *first* period of incarceration at Osborn (1992–94).  During his second period of confinement at Osborn (2014–18), Francis also raises issues regarding nauseating smells and the continued housing of inmates in the Q-Block housing unit even though the Q-Block housing unit was known to be structurally unsound.  Although he does not elaborate, Francis also indicates that he seeks to vindicate violations of:  his "basic human rights," his "civil rights," his "right of access to the courts," "Equal Protection," and the Clean Water Act.  *See* Compl., Doc. No. 1 at 2; *see also id.* at ¶ 57. All of those claims, however, are sufficiently different from the core of Francis's claims—those concerning the condition of the water and of other hazardous materials at Q-Block at Osborn between 2014 and 2018—that I will sever them under Federal Rule of Civil Procedure 21.

Multiple defendants may be joined in a single action only if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2).  Courts determine what constitutes the same transaction or occurrence "on a case by case basis."  *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008).  The Second Circuit has observed, in the context of Fed. R. Civ. P. 13(a), that whether a counterclaim arises out of the same transaction or occurrence as the original claim depends upon an assessment of the "logical

---

*al.*, No. 3:19-cv-941, Compl., Doc. No. 1, at 25–27 (prayer for relief).

relationship" between the claims and a determination of whether the "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978) (cleaned up).  Courts apply an analogous interpretation to the terms transaction or occurrence as used in Rule 20(a)(2).  *See Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 228 (E.D.N.Y. 2013).

If parties have been misjoined, a court may, upon motion or on its own, "drop a party" or "sever any claim against a party."  *See* Fed. R. Civ. P. 21; *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1082 (2d Cir. 1988).  In deciding whether to sever a claim, courts weigh the following factors:  whether "(1) the claims arise out of the same transaction or occurrence; (2) the claims present some common question of law or fact; (3) [] settlement of the claims or judicial economy would be facilitated; (4) prejudice would be avoided; and (5) different witnesses and documentary proof are required for the separate claims." *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263 (D. Conn. 2012) (citing *Greystone Cmty. Reinv. Ass'n v. Berean Capital, Inc.*, 638 F. Supp. 2d 278, 293 (D. Conn. 2009)).  "Courts may order a Rule 21 severance when it will serve the ends of justice and further the prompt and efficient disposition of litigation." *T.S.I 27, Inc. v. Berman Enters., Inc.,* 115 F.R.D. 252, 254 (S.D.N.Y. 1987).

Francis's claims all concern his confinement at Osborn, but certain of his claims regard periods of time and legal theories different from those at the core of Francis's claims (those to be consolidated into *Toliver*).  Proceeding on those disparate claims would necessarily involve different witnesses and factual proof.  Maintaining all of Francis's claims in one action would delay the resolution of this case due to the extensive scope of discovery that would be required

(spanning 30 years).  Thus, not all of Francis's claims are logically related to each other—they do not form part of the same transaction or occurrence.  The interests of justice will be served by severance under Rule 21.  I sever the following claims from this action:

- Francis's Eighth Amendment claims regarding the conditions of confinement at Osborn between 1992 and 1994;

- Francis's Eighth Amendment claims regarding the nauseating smell in the Q-Buildings at Osborn between 2014 and 2018;

- Francis's Eighth Amendment claims regarding the structural unsoundness of the Q-Block between 2014 and 2018; and

- Francis's various claims (to the extent that he makes them) based on violations of (1) his right of access to the courts, (2) the Fourteenth Amendment's Equal Protection Clause, and (3) the Clean Water Act.

Relatedly, I sever the following parties from this action:

- Former DOC commissioner Larry Meachum (1987–94);

- Former Osborn warden Lawrence R. Tilghman (1989–93);

- Former Osborn acting warden Michael B. Bonzagni (1993); and

- Former Osborn facility engineer John Doe (1992–94).

If Francis wishes to pursue those claims against those parties, he may do so in separate lawsuits.  I remind Francis, though, that his constitutional claims arising from 1992 to 1994 may be barred by the relevant three-year statute of limitations.  *See Lounsberry v. Jeffries*, 25 F.3d 131, 133 (2d Cir. 1994) ("[A] state's personal-injury statute of limitations . . . should be applied to all § 1983 claims"); Conn. Gen. Stat. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."); *Pinkston v. Connecticut*, 2009 WL 2852907, at *2 (D. Conn. Sept. 2, 2009) (applying three-year statute of limitations from Conn. Gen. Stat. § 52-577 to section 1983 action and noting that doing so "has

been uniformly found to be . . . appropriate . . . [in] federal civil rights actions").  In addition, Francis's claim regarding a violation of the Clean Water Act during the same period (1992 to 1994) may be barred by the relevant five-year statute of limitations.  *See* 33 U.S.C. § 1365(a) (Clean Water Act's citizen suit provision, which is silent on limitations period); 28 U.S.C. § 2462 ("Except as otherwise provided by an Act of Congress, an action . . . for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ."); *U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, LLC*, 257 F. Supp. 2d 407, 426 (D. Me. 2003) (citing cases applying the five-year statute of limitations from 28 U.S.C. § 2462 to citizen suits brought pursuant to the Clean Water Act (33 U.S.C. § 1365(a)).

## ORDERS

Francis's Eighth Amendment claim against the State of Connecticut and any of its agencies are **dismissed**.

Francis's Eighth Amendment claims arising from his exposure to contaminated water, PCBs, and friable asbestos during his confinement at Osborn between 2014 and 2018 against Warden Maldonado, Commissioner Semple, Warden Faneuff, and Kevin Roy may proceed.

Francis's other claims and the other defendants—as described above—are severed from this action pursuant to Federal Rule of Civil Procedure 21.  If Francis wishes to pursue those claims against those defendants, he may do so in separate lawsuits.

The clerk of the court is instructed to consolidate this action, so limited, into *Toliver, et al. v. Semple, et al.*, No. 3:16-cv-1899 (SRU).

SO ORDERED at Bridgeport, Connecticut this 19th day of October 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge